Filed 12/13/23  In re B.N. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re B.N., Persons Coming Under the Juvenile Court Law. | |
| MADERA COUNTY DEPARTMENT OF SOCIAL SERVICES/CHILD WELFARE SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>N.N.,<br><br>Defendant and Appellant. | F086258<br><br>(Super. Ct. Nos. MJP018662, MJP018663)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Madera County.  Thomas L. Bender, Judge.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Regina A. Garza, County Counsel, and Christopher B. Dorian, Deputy County Counsel, for Plaintiff and Respondent.

---

[*]     Before Levy, Acting P. J., Peña, J. and De Santos, J.

-ooOoo-

Nathan N. (father) appeals from the April 20, 2023, findings and orders denying his Welfare and Institutions Code section 388[1] petition and terminating his parental rights under section 366.26 to his children B.N. and P.N. (together the minors).[2] We affirm.

### STATEMENT OF THE CASE AND FACTS

*Referral on B. and P.*

In early December 2020, B. (then age 1) and P. (then 6 days old) came to the attention of the Contra Costa County Department of Children and Family Services (Contra Costa County department) due to allegations of substance abuse by mother and father, as well as positive tests for methamphetamine by mother at the minors' births.

*Detention*

A section 300 petition was filed December 4, 2020. The petition alleged, as to b-1, that mother has a chronic substance abuse problem that impaired her ability to parent in that (a) P. tested positive for methamphetamine at birth; (b) mother tested positive for methamphetamine at the time of P.'s birth; (c) "the sibling" tested positive for methamphetamine at the time of his birth in 2019; (d) mother tested positive for amphetamines and methamphetamines 13 days before the "sibling's birth"; (e) mother used "narco" in the past; (f) mother used methamphetamine "here and there, rarely, and in a blue moon,"; (g) mother admitted she last used methamphetamine "a few months ago"; and (h) the father and mother used methamphetamine together twice before the "child's sibling" was born.

As to b-2, the allegation alleged specifically, as to father, that he has a chronic substance abuse problem that impaired his ability to parent in that: (a) he uses marijuana

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]    Mother Dawn D. has not appealed.

2.

once a month for back pain; (b) he used methamphetamine "a month ago"; and (c) father and mother used methamphetamines together twice before the "child's sibling" was born.

A detention hearing was held. The minors were detained, father found to be the presumed father of both minors, and mother and father were both ordered supervised visits. Jurisdiction was set for January 7, 2021.

*Jurisdiction*

At jurisdiction January 7, 2021, mother and father both appeared with counsel. The hearing was continued to January 28, 2021, for pretrial, and February 18, 2021, for trial.

On January 28, 2021, father filed objections to the Contra Costa County department's jurisdiction and disposition report and a demurrer to the petition, claiming the allegations against him failed to show substantial evidence of a risk of harm to the minors due to his occasional use of marijuana and methamphetamine. The juvenile court continued the hearing to February 18, 2021, for a contested hearing.

At the February 18, 2021, contested hearing, mother signed a waiver of rights and pled no contest to the allegations in the petition as amended, to show mother having a chronic substance abuse problem that impaired her ability to parent in that both she and P. tested positive for methamphetamines at the time of P.'s birth. (§ 300, subd. (b)(1) [allegations b-1 (a)-(b)].) The remaining allegations, including those as to father, were dismissed by the Contra Costa County department (§ 300, subds. (b)(1) [allegations b-1 (c)-(h), b-2 (a)-(c)].)[3] The minors were found to be dependents of the court and the case transferred to Madera County for disposition.

---

[3] The record did not contain a reporter's transcript of this hearing. We asked that the parties supply this court with a such a transcript, if available. We also asked the parties provide a settled statement of facts. Both have now been provided. The transcript indicates that the department would dismiss the allegations as to father, "if Father had gotten involved in case plan services, specifically drug testing," which it stated he had.

*Disposition*

Following a transfer-in hearing on March 4, 2021, the juvenile court appointed counsel for mother, father and the minors and set disposition for March 22, 2021. The Madera County Department of Social Services (department) filed a motion to continue disposition to allow additional time for assessment of the family. Following several continuances, the disposition hearing was set for April 29, 2021.

At the disposition hearing, mother and father submitted on the department's report. Finding both mother and father had made only minimal progress toward alleviating or mitigating the causes necessitating out of home placement of the minors, the juvenile court removed the minors from mother and father's care and ordered reunification services for both mother and father. Mother's case plan required a parenting program and substance abuse testing; father's required a parenting program and the ability to demonstrate that he remained drug free and refrained from associating with people known to be users. Both parents were ordered supervised visitation and to submit to random drug testing. Mother and father were advised of their appeal rights and a six-month review hearing was set for October 28, 2021.

*Six-Month Review*

At the six-month review hearing October 28, 2021, the department recommended terminating family reunification services and setting a section 366.26 hearing. While father completed his parenting program, he consistently tested presumptive positive (failure to test) or positive for drug use. While the department recommended father participate in a mental health assessment, he was found not to meet the criteria for mental health services. It was also recommended by the department that father undergo an alcohol and drug assessment, but was a "no-show." Visitation with the minors was consistent and appropriate. The juvenile court noted that both mother and father had positive drug tests and should be in outpatient services. The juvenile court advised

4.

mother and father that time was "of the essence," and advised both to make this a priority. The matter was continued for a contested hearing December 6, 2021.

After various continuances, the contested review hearing was held January 31, 2022. Neither mother nor father appeared. Father's counsel indicated that father was aware of the hearing and had indicated he would be present. Counsel for each parent objected but submitted on the matter. The juvenile court adopted the recommendations of the department, terminated reunification services and set a section 366.26 hearing for May 26, 2022. Visitation for mother and father was continued and both were notified by mail of their writ rights.

### Section 366.26 Hearing

At the May 26, 2022, section 366.26 hearing, father appeared with counsel. Mother was not present as she was in an inpatient program. Mother's counsel requested a continuance to file a section 388 petition. The juvenile court set the matter for June 9, 2022, for a section 388 hearing and June 20, 2022, for a contested section 366.26/388 hearing.

### Section 388 Petitions

Mother filed a section 388 petition on June 2, 2022, requesting the minors be placed with her since she was in an inpatient treatment program. Mother also requested that the juvenile court evaluate maternal grandmother for placement or guardianship of the minors.

What followed were numerous continuances, some made by mother and others by father. During this time frame father's counsel was relieved and other counsel appointed. And on October 13, 2022, father filed a section 388 petition stating that he had had an "exemplary record" over the past 12 months and asking that the minors be placed with him with a plan of family maintenance. Father's petition included two attachments of his drug testing records. Following father's filing of the section 388 petition, other

5.

continuances occurred, and eventually November 22, 2022, was set for a confirmation hearing and December 22, 2022, was set for contested section 388 and 366.26 hearings.

However, on November 22, 2022, neither mother nor father appeared, but counsel for father informed the juvenile court that mother, who now resided in Contra Costa County, gave birth to another child and a new case was opened there. The hearing on that new case was set for December 6, 2022. The juvenile court confirmed December 22, 2022, for the section 388 and 366.26 hearings, with a confirmation hearing on December 6, 2022.

*De Facto Parent Request*

After several more continuances, a contested de facto parent request hearing was held. After counsel was appointed for the de facto parent, the juvenile court granted the de facto parent request of M.P. The contested section 388 and section 366.26 hearings were continued to February 6, 2023.

*Contested Section 388 and 366.26 Hearings*

At the February 6, 2023, contested hearing, mother and father were both present and mother withdrew her section 388 petition. Father agreed to a combined section 388 and section 366.26 hearing.

As to the section 388 petition, the parties stipulated that father's witness, David Engelhart from Omega Labs, was a lab scientist with expertise in drug testing procedures. Engelhart testified that he reviewed father's drug test results from a November 22, 2022, hair follicle test. Engelhart testified that hair grows at different rates on different parts of the body and due to the different growth rate of an individual's hair, the hair follicle which was collected from father went back about 30 days, but the drug use could stay in a hair follicle for up to a year. As such, he had no way to pinpoint when the drug usage happened during that year.

Father testified that, after the case moved to Madera County in April 2021, he was ordered to complete parenting classes and drug testing. He started drug testing in

6.

October 2021 and had been consistent since.  He had had one positive test for methamphetamine in October 2021, after which he decided to "turn it around" and stop using.  While drug tests after that date had been positive for marijuana, father alleged the department had not raised any concerns about his marijuana use.

Father testified that he completed a parenting class in September 2021, had completed a 52-week drug counseling program in October 2022, and had learned about his triggers, causing him to change his surroundings and to keep away from certain situations and environments.

Father testified that he visited the minors consistently and had tried to get more visitation times.  At visits, the minors ran to him, gave him hugs and called him daddy. He brought them snacks and clothes, if needed.  While mother and father had initially visited together, he visited on his own for a time, and they were now visiting together again.  The minors' grandmother and older sister, Sophia, also came to visits.

Father testified he had housing with a room for the minors.  Father lived with maternal grandfather, whom he admitted had a criminal history which he thought included drug offenses.  Also living in the home were grandfather's girlfriend and her children.  Father moved out for a while when grandfather's girlfriend had a CPS case, but after her children were returned to her, he moved back in.

When asked about the positive drug test result from November 2022, father testified that his head hair was too short at the time as he had just gotten a haircut, and so they used a leg hair which they shaved off.  Father again denied any amphetamine use after October of 2021.

Father testified he was self-employed in Madera and also worked part-time in the Bay Area.  When he was in the Bay Area he stayed with friends and visited his "other" daughter there. Father asked to have B. and P. returned to his care and he had a plan for childcare for them, stating he had enough family around to help out.

Father's youngest daughter, K., who was detained at birth in Contra Costa County, was now four months old. Father had three other children besides B. and P.: one age 20 in Oakhurst, one age 18 in Los Angeles, and also the four-month-old daughter. Father testified that B. and P. consider mother's daughter, Sophia, age 7, an older sister. Sophia lived with her father in Martinez. Father testified that the minors had many relatives who visited them. According to father, he was no longer with mother, although they coparented.

Paternal grandmother Cheryl M. testified to father's relationship with B. and P. and said they were affectionate with him. If the minors were returned to father, she would be a support person.

Father's request was that the juvenile court return the minors to his care on a plan of family maintenance, as the minors were very young and had a strong bond with him.

The department's report filed in anticipation of the section 388 hearing, as well as the report for the section 366.26 hearing, noted father's visits with the minors went well, although they had not elevated to unsupervised due to concerns with mother and father's failure to comply with their case plan objectives. During visits, father engaged in age appropriate activities with the minors, and they were affectionate with each other. Both reports recommended that father not be provided family maintenance services for the minors as he continued to test positive for marijuana and had recently tested positive in November 2022 for methamphetamine use in a hair panel test. The report also noted eight no shows for drug testing in September to December of 2021 and also twice in January 2022, and in July, August, and October 2022.

Following testimony, the juvenile court took the matter under submission and, on April 20, 2023, tentatively denied father's section 388 petition. The juvenile court found changing but not changed circumstances, noting father's continued positive marijuana tests, as well as his November 2022 positive test for methamphetamine. While father had stated that he was not using drugs or spending time around others who did, his November

2022 test coincided with the birth of the new baby and mother was testing positive. The juvenile court also noted the minors had been out of the home almost two years and were doing well in the security and stability of their care providers.

As for the section 366.26 hearing, the juvenile court found that the department had shown by clear and convincing evidence that the minors were adoptable and that no sibling relationship exception had been shown. While P. had been out of the home since birth, B. had been out of the home for half his life, and the minor's half siblings were older. While mother had argued a strong bond existed between the minors and their sibling Sophia, the juvenile court disagreed, finding no strong bond between P. and B. and their half siblings had been shown such that maintaining the sibling relationship outweighed the benefit of a permanent home.

The juvenile court also found the evidence did not show that maintaining a relationship with mother and father outweighed the benefit of adoption since the minors had been out of the home such a long time and had a bond with their current care providers.

Father's counsel argued again that father's positive November 2022 drug test was not conclusive of recent drug use, as testified to by the expert that tests results could have gone back at least two years. Counsel also argued that father's marijuana use was not an issue, as the department had only insisted that he not abuse drugs. As such, counsel argued the minors should be placed with father. Counsel further emphasized father's bond with the minors and their beneficial relationship.

Counsel for the department reminded the juvenile court that father had not ever had a drug test where he didn't test positive for marijuana, showing a pattern of constant use. The minors' relationship with Sophia did not rise to the level of outweighing stability in their current placement. And while visitation was consistent with mother and father, it was not extensive and did not demonstrate a parent-child relationship exception.

The juvenile court followed its tentative decision, denied the section 388 petition, and terminated mother and father's parental rights.

## DISCUSSION

I.    SECTION 388 PETITION

Father contends the juvenile court abused its discretion when it denied his section 388 petition asking that the court return the minors to his care under a family maintenance plan.  He contends this is especially so since he was a "non-offending parent" after the section 300 allegations were dismissed as to him, and the only requirements of him were to complete a parenting program; to demonstrate the ability to remain drug free by showing up for visits without signs of being under the influence; to submit to drug tests as required; and not to associate with known users.  As argued by father, "[b]y the section 388 hearing in April 2023 [father] had complied with all requirements, establishing changed circumstances."

*Applicable Law*

Under section 388, subdivision (a)(1), a parent may petition the juvenile court to change, modify, or set aside a previous order in dependency proceedings. "The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances and (2) that the proposed modification would be in the best interests of the child." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 (*Mickel O.*).)

To satisfy the first prong, "the change in circumstances must be substantial."  (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)  Merely changing—as opposed to changed—circumstances will not suffice.  (*Mickel O., supra,* 197 Cal.App.4th at p. 615.)

For the second prong, specifically when determining whether reinstatement of reunification services is in the best interests of the child, the juvenile court must consider whether "the specific factors that required placement outside the parent's home" have been remediated and prioritize "the goal of assuring stability and continuity" for the

10.

child.  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 463–464.)  "[A]fter reunification services have terminated, a parent's petition for ... an order ... reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)  Because "[a] petition under this section must be liberally construed in favor of its sufficiency[,] ... if the petition presents *any* evidence that a hearing would promote the best interests of the child, the [juvenile] court must order [a] hearing."  (*Angel B., supra,* at p. 461.)

## Standard of Review

We review the denial of a section 388 petition for abuse of discretion.  (*Mickel O., supra,* 197 Cal.App.4th at p. 616.)  Thus, we must affirm "unless the [juvenile] court exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination."  (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

## Analysis

Reunification services for father were terminated on January 31, 2022.  Father did not appear in court for the contested hearing and could not be reached by his counsel.  By that time the minors had been in foster care for a full year.  Father filed his section 388 petition almost nine months later on October 13, 2022, but the hearing was not concluded until April 20, 2023.

At the April 2023 hearing, father's counsel acknowledged that father's case plan as of April 2021 was not to abuse drugs.  However, father tested positive for methamphetamine in October 2021; between September 28, 2021 and October 28, 2022, he failed to show for drug testing on 13 occasions; and on October 19, 2021, he refused to complete a hair panel test.  All of father's drug tests were positive for marijuana, although father claimed this was not a concern as he did not use marijuana around the minors.  He acknowledged that he did not have a medical marijuana license, although he had had one in the past.  While father questioned the validity of the November 22, 2022, positive test for methamphetamine, citing expert Engelhart's testimony that the hair test

11.

could detect substance use in an individual as far back as a year, this would still be sometime after the October 21, 2021, date father claims was the date of his sobriety. As for changed circumstances, father also cites his completion of a 52-week drug counseling program in October 2022, and his attendance at bi-weekly meetings at Celebrate Recovery. However, "a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program." (*In re N.F.* (2021) 68 Cal.App.5th 112, 121.)

Thus, we agree with the juvenile court that father's circumstances were changing but not changed, thereby failing to satisfy the first prong of a section 388 petition. (*In re Ernesto R., supra,* 230 Cal.App.4th at p. 223.) Merely changing—as opposed to changed—circumstances will not suffice, and therefore there is no abuse of discretion on the part of the juvenile court in denying the section 388 petition. (*Mickel O., supra,* 197 Cal.App.4th at p. 615.)

## II.    TERMINATION OF PARENTAL RIGHTS

Father also contends the juvenile court erred in finding that the beneficial parent-child relationship exception did not apply to the termination of his parental rights because the record indicates that the minors would benefit from continuing the relationship. We conclude the juvenile court did not err in finding the exception inapplicable.

*Legal Principles*

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id.*, subd. (c)(1)(B)(i).)

12.

A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.) Thus, the parent must prove three elements in order to prevail under the beneficial parent-child relationship exception: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631, italics omitted (*Caden C.*).)

The first element of the beneficial parent-child relationship determination asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders. (*Caden C., supra,* 11 Cal.5th at p. 632.) The focus is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact. (*Ibid.*)

The second element of the exception asks whether the child would benefit from continuing the relationship. (*Caden C., supra,* 11 Cal.5th at p. 632.) The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, at p. 632.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship — in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra,* 11 Cal.5th at p. 633.) Potential negative effects from severance of the relationship might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Ibid.*) An adoptive home might provide a

new source of stability that alleviates emotional instability and preoccupation leading to those problems, making the loss "not, at least on balance, detrimental." (*Ibid.*) Under this element, the court is again guided by the child's best interest, but in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid.*)

In *Caden C.*, the appellate court held "that because the parent continued to struggle with substance abuse and mental health issues and because of the risks of foster care and benefits of the potential adoptive home, no reasonable court could find the child's relationship with his parent outweighed the benefits of adoption." (*Caden C., supra,* 11 Cal.5th at pp. 625–626.) Rejecting that conclusion, our Supreme Court found "[t]he Court of Appeal did not explain how the parent's struggles related to the specific elements of the statutory exception: the importance of the child's relationship with the parent or the detriment of losing that relationship." (*Id.* at p. 626.) A parent's struggles with issues that led to dependency were determined to be relevant only to the extent they inform whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it." (*Id.* at p. 638.)

*Standard of Review*

Appellate courts review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a " 'hybrid' " standard. (*Caden C., supra,* 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id.* at pp. 639-640.) The juvenile court's decision as to the third element — whether termination of parental rights would be detrimental to the child — is reviewed for an abuse of discretion. (*Id.* at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

14.

Thus, the beneficial parent-child relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*Autumn H., supra,* 27 Cal.App.4th at p. 576.) The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Caden C, supra,* 11 Cal.5th at pp. 639–640.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640–641.)

*Analysis*

In the present case, the juvenile court determined that father did not meet his burden in regard to the beneficial parent-child relationship exception. As argued by father, in doing so, the juvenile court failed to address the exception using the analysis of *Caden C.* However, while section 366.26, subdivision (c)(1)(D) requires the juvenile court to " 'state its reasons in writing or on the record' " in concluding that termination of parental rights *would* be detrimental to the child, the juvenile court is not required to recite specific findings when it concludes that terminating parental rights *would not* be detrimental to the child. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) Although a trial court's statement of its findings or an explanation of the reasons for its decision may be helpful in conducting appellate review, it is not a legal requirement. (*Ibid.*)

Here, while not mentioning *Caden C.* specifically, there is nothing in the juvenile court's ruling to show it based its decision on grounds identified in *Caden C.* to be improper. The juvenile court did not address the issue of visitation, but the department agreed that father had consistent visitation and contact with the minors, thus satisfying the first prong of the section 366.26, subdivision (c)(1)(B)(i) test.

15.

As to the second, the record demonstrates that father's relationship with the minors during visits was positive. Both minors were observed to be affectionate with father, to call him "dad," and to want to sit on his lap or search for him if they could not visibly see him. Furthermore, the department did not contend father did not have a bond with the minors.

As to the final element, the juvenile court stated in its tentative and then later adopted ruling, "I don't think the evidence shows that maintaining a relationship with the parent outweighs the benefit of adoption given that these two [minors] have been out of [the] home for as long as they've been, and they have a bond with the current care providers."

Citing numerous positive interacts he has had with the minors, father argues the juvenile court failed to consider the evidence of an emotional bond between the minors and father, and thereby did not engage in the analysis of detriment to the minors should that relationship be severed, as necessary to the balancing test required under *Caden C.* We, however, do not read the juvenile court's ruling as finding the minors did not have an emotional attachment to father, as he suggests. Rather, we read the juvenile court's ruling to reflect its finding that, on balance, the security and stability of adoption outweighed any harm to the minors from the loss of the parent-child relationship with father so that terminating parental rights would not be detrimental to them.

Father also notes — addressing his "difficulty with substance abuse" — that under *Caden C., supra,* 11 Cal.5th at pages 637 – 638, " a parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the parental-benefit exception" and "may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent." This is an accurate statement of the Supreme Court's holding. (See *Caden C., supra,* at pp. 637–638.) The point is, however, not relevant here; the record does not show that the juvenile court based its detriment finding

upon father's continued struggles with substance abuse or assigned blame or made moral judgments because of any failings by father. (Cf. *In re B.D.* (2021) 66 Cal.App.5th 1218, 1228 [reversal of § 366.26 order based upon juvenile court's having "relied heavily, if not exclusively, on the fact that the parents had not completed their reunification plans and were unable to care for the children based on their long term and continued substance abuse"].)[4]

While father doubtlessly loved the minors, it is clear that the juvenile court did not abuse its discretion in concluding that father had not established the third prong of the parental-benefit exception. The court, after weighing the benefits to the minors in receiving a permanent adoptive home against any detriment to the minors resulting from the termination of the parental relationship, properly found that father had not shown that the minor's relationship to him was "so important to the [minors] that the security and stability of a new home wouldn't outweigh its loss." (*Caden C., supra,* 11 Cal.5th at pp. 633–634.)

## DISPOSITION

The juvenile court's orders are affirmed.

---

[4]     We note that at the combined hearing, there was extensive testimony concerning father's substance abuse history, his relapses during the time he received reunification services, the length of time before the hearing that he had abstained from use of substances, and the progress he had made toward recovery. Regardless of their significance to the court's determination of whether the parental-benefit exception applied, these were all issues of high relevance to the court's decision on the section 388 petition. (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 53 [in denying § 388 petition, court properly considered parent's substance abuse history, relapses, and progress toward recovery], disapproved on another ground in *Caden C., supra,* 11 Cal.5th at p. 636, fn. 5.)